UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| PACIFIC LIFE INSURANCE COMPANY, 700 Newport Center Dr., Newport Beach, CA 92660, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO BANK, NA, as Securities Intermediary, 101 N. Phillips Ave., Sioux Falls, SD 57104 <br><br> Defendant. | C.A. No. 8:21-cv-737 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Pacific Life Insurance Company ("Pacific Life"), files and asserts this Complaint against Defendant, Wells Fargo Bank, NA, solely in its capacity as Securities Intermediary ("Wells Fargo"), and in support thereof, alleges and says:

## PARTIES

1. Pacific Life is an insurance company incorporated under the laws of the State of Nebraska with its principal place of business in the State of California.

2. Wells Fargo is a National Banking Association organized and existing under federal law with its Articles of Association stating its main office is located at an address in the State of South Dakota. Wells Fargo is a citizen of South Dakota for purposes of diversity jurisdiction. Wells Fargo is named as a party to this action solely because, as set forth below, in its capacity as Securities Intermediary, it holds bare legal title of the Policy (as defined herein).

**JURISDICTION AND VENUE**

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff, a citizen of Nebraska and California, and the Defendant, a citizen of South Dakota, and because the amount in controversy exceeds $75,000.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Plaintiff's claims occurred in the District of Maryland.

**FACTS COMMON TO ALL CLAIMS**

**The Policy Was an Illegal Human Life Wager and
Was Procured by Investors Who
Lacked an Insurable Interest in Mr. Schwartzberg's Life**

**Background**

5. For hundreds of years, speculators have sought to use insurance to wager on the lives of strangers. *See, e.g.*, *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*") (noting that life wagering has existed "[s]ince the initial creation of life insurance"); *Sun Life v. Wells Fargo*, 238 N.J. 157, 164 (2019) ("*Bergman*") (explaining that human life wagering has existed since at least 1419).

6. Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, *Price Dawe*, 28 A.3d at 1069 (citing Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010)).

7.      Making matters worse, in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only a limited number of seniors who had unwanted policies of sufficiently high value. As a result, promoters sought to solve the supply side shortage by generating new, high value policies. These resulting life insurance policies came to be known as Stranger Originated Life Insurance ("STOLI") policies.

8.      One such STOLI promoter was a family of interrelated Delaware entities known generally as Coventry, which operated an extremely large Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained below, Coventry operated a "back-end" STOLI scheme using non-recourse premium finance program.

9.      Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

10.     The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

11.     The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the

policies at issue were procured and paid for by third parties without an insurable interest in the insureds.

12. Not only do STOLI schemes violate insurable interest laws and the public policy against wagering on human life, but these schemes victimize the seniors who are induced to permit entities like Coventry to procure, or cause to be procured, policies on their lives. Indeed, although STOLI "may appear to be a 'victimless' crime," STOLI transactions actually harm seniors in a variety of ways, including by exposing them to possible litigation and other financial losses. *See* Fla. Office of Ins. Regulation, *Report on Stranger Originated Life Insurance ("STOLI") and the use of Fraudulent Activity to Circumvent the Intent of Florida's Insurable Interest Law*, at 12 & n.18 (Jan. 2009), available at http://www.floir.com/siteDocuments/STOLIRpt012009.pdf (hereinafter "STOLI Report").

13. For example, STOLI schemes often use "fraudulent means such as lying, misrepresentation or omission of material facts" in policy applications. *Id*. at 12. Such false statements often include misrepresentations about "the true net worth of the proposed insured" and about "the insurable interest of the intended policy owner." *Id*.

14. In many cases, these misrepresentations are made without the seniors' knowledge. Indeed, as the Florida Office of Insurance Regulation found when it studied STOLI, "[s]eniors are not told about misrepresentations made on their applications by an agent or broker involved in the scheme." *Id*. at 13.

15. In order to induce seniors into participating in these schemes, "[s]eniors are: 'wined and dined'; promised 'free insurance'; told that they are in the situation of 'heads, I win or tails, I can't lose'; and promised cash or a profit for their participation in these schemes." STOLI Report at 13.

16. But these promises of "free insurance" are an illusion because STOLI policies are void *ab initio*, meaning that no insurance coverage ever really existed. *Price Dawe*, 28 A.3d at 1067-68.

17. And rather than enjoy the benefit of any actual life insurance, "[s]eniors that are lured into participating in STOLI schemes for financial gain are at risk of owing money when the fraudulent scheme is uncovered." STOLI Report, at 20.

18. In short, STOLI policies violate insurable interest and anti-wagering laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of the insureds—into cash machines whereby strangers to the insureds are more interested in seeing the insureds dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

19. It is widely recognized that one of the most common STOLI schemes involved the use of two-year, non-recourse premium financing. Under this type of STOLI scheme, a trust is typically created in the insured's name to serve as the nominal owner of the policy and to enter into a two-year loan where the only collateral is the policy itself, which is assigned as such to the STOLI lender. The loan is designed to coincide with the policy's two-year contestable period, and the policy is relinquished or sold to an investor after that period has expired.

20. The Delaware Supreme Court in *Price Dawe* recognized that policies created using this same type of two-year non-recourse premium finance scheme—which is what Coventry orchestrated here—are STOLI and thus void *ab initio*. 28 A.3d at 1070-71, n.27 (citing Martin, *Betting on the Lives of Strangers*, 134 U. Pa. J. Bus. L. at 175 (STOLI exists where a trust is used to own the policy and the interests in the trust are transferred to an investor at the end of a two-year loan)); *id.* at n.32 (citing *Spin-Life Insurance Policies: A Dizzying Effect on Human Dignity*

*and the Death of Life Insuranc*e, 7 Ave Maria L. Rev. 605, 606, 622-24 (2009) (STOLI includes two-year loans where "the loan amount, interest, and fees imposed by the investors are high enough that the applicant is forced to accept the offers made by the investors and transfer ownership of the policy")).

21. Since at least 1914, Delaware law has followed the United States Supreme Court's decision in *Warnock v. Davis*, 104 U.S. 775 (1881).  *See Balt. Life Ins. Co. v. Floyd*, 28 Del. 201, 207, 91 A. 653, 656 (Del. 1914) ("Where a third party, without any insurable interest in the life of another, procures a policy of insurance on the life of such person, either by having a policy issued directly to himself, or by having the person whose life is insured take out a policy to himself, and then assign it, these facts, as is held in *Warnock v. Davis* [104 U.S. 775, 26 L. Ed. 924], conclusively show that the transaction is a mere speculation on the life of another, and as such is contrary to public policy, and therefore void.").

22. Although dating back to 1881, *Warnock* involved a stranger-originated, premium-financed life insurance policy where an insured was induced to apply for a policy that was paid for by an entity known as the Scioto Trust Association.  In exchange, the trust promised that when the insured died, one tenth of the policy's death benefit would be paid to his wife.  After the insured passed. the Court held that the policy was a mere wager on the life of the insured.

23. Not surprisingly, therefore, every court that has considered Coventry's two-year, non-recourse premium finance scheme under Delaware law has held, as a matter of law, that: (i) Coventry operated a STOLI program; (ii) policies produced by that program are void *ab initio*; and (iii) where, as here, an insurer challenges the policy for lack of insurable interest, no death benefit need be paid.  *See, e.g., Sun Life v. U.S. Bank*, No. 14-CIV-62610, 2016 WL 161598, at *10-13 (S.D. Fla. Jan. 14, 2016) ("*Malkin*"), *aff'd*, 693 F. App'x 838 (11th Cir. June 12, 2017);

*U.S. Bank v. Sun Life*, No. 14-4703, 2016 WL 8116141, at *12-14 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"), *adopted in full*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601, 609 (D. Del. 2019) ("*Sol*").

24.  The New Jersey Supreme Court also recently followed Delaware's lead, holding that STOLI policies violate insurable interest laws, and specifically holding that two-year, non-recourse STOLI schemes are a common way in which STOLI policies were created. *See Bergman*, 238 N.J. at 171-72 ("Generally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value. The investor may lend the insured 'the money to pay the premiums for' the period of incontestability, typically two years. It is also common for an insured to buy the policy in the name of a trust and name a 'spouse or other loved one as the trust beneficiary.' In such arrangements, [i]f the insured dies within [the contestability] period, his spouse, as beneficiary of the insurance trust, will get the death benefit (the free insurance), pay back the loan plus interest from the proceeds, and often pay the broker up to fifty percent of the benefit received. If the insured lives beyond two years or the contestability period, then the life settlement company buys the beneficial interest in the insurance trust, paying the insured a lump sum percent of the face value of the policy . . . . The life settlement company or its investors will continue to pay the premiums on the policy, and when the insured dies, they will get the death benefit. Clearly, the sooner the insured dies, the greater the company's profit. STOLI arrangements thus present a significant legal problem: the investors have 'no insurable interest in the life of the insured.' As a result, the transactions pose questions in light of New Jersey's policy against wagering.") (citing Martin, *Betting on the Lives of Strangers*, 13 U. Pa. J. Bus. L. at 188).

25.  Likewise, state insurance departments have long recognized that such two-year, non-recourse loan schemes are STOLI. *See* Fla. Office of Ins. Regulation, *Secondary Life*

*Insurance Market Report To The Florida Legislature*, at 11-12 (Dec. 2013), available at https://www.floir.com/siteDocuments/SecondaryLifeInsMarketReport2013.pdf ("In a typical STOLI transaction, the promoters and investors may establish an irrevocable trust, obtain an insurance policy on a senior, obtain a premium-finance loan, and pay the life insurance policy premiums for two years (i.e., the contestable period). The money needed to pay these premiums, which can be substantial, is financed through premium-finance lenders. Typically, these premium-finance loans are non-recourse loans, meaning that the life insurance policy is the only collateral for the loan and the premium-finance lender can pursue only the collection of the collateral if there is a default.").

26. And as to Coventry specifically, it has been determined that Coventry did not act in "good faith" when it procured policies using its two-year, non-recourse premium finance program. *See Sol*, 369 F. Supp. 3d at 614 ("On the record before the Court, taking the evidence in the light most favorable to Defendant, a reasonable factfinder could only find that the third parties – Coventry, LaSalle, and/or SFG – did not act in good faith.").

27. Moreover, Coventry has been investigated by state insurance commissioners, which have made findings in connection with Coventry's alleged fraudulent activities in the business of life insurance. *See* Testimony of Mary Beth Senkewicz, at 9-11 (summarizing investigations by the insurance departments of New York and Florida into fraudulent activities by Coventry, noting that Coventry agreed to pay a $1.5 million fine in connection with Florida's investigation).

### The Allan Schwartzberg Policy

28. In or around late 2005, Allan Z. Schwartzberg was in his early-seventies living in Bethesda, Maryland.

29. At no time did Coventry have an insurable interest in Mr. Schwartzberg's life.

30. In or around late 2005, Coventry, by way of its agent, Howard Kaye—at the time an insurance producer at Barry Kaye Associates, Inc., located in Boca Raton, Florida—used Mr. Schwartzberg to procure from Pacific Life a $10,000,000 life insurance policy on the life of Mr. Schwartzberg (the "Policy")—not for Mr. Schwartzberg or his family or for a legitimate insurance purpose—but rather for Coventry itself.

31. This was done using Coventry's two-year, non-recourse premium finance STOLI scheme, and the transaction at issue here is a mirror image of the STOLI transactions Coventry concocted in *Malkin*, *Van de Wetering*, and *Sol*.

32. To that end, on or about October 27, 2005, to facilitate this STOLI transaction, Coventry created a sham Delaware statutory trust that Coventry called the Schwartzberg Family Trust (the "Sham Trust"). Coventry then installed its go-to trustee, Wilmington Trust Company ("Wilmington Trust"), as the trustee of the Sham Trust, and thereafter used the Sham Trust as a cover to procure the Policy.

33. On or about October 27, 2005, Coventry, by way of Mr. Kaye, submitted to Pacific Life an application for the Policy. A copy of the application is attached hereto as Exhibit "A." (Appropriate redactions of personal information have been made.)

34. The application indicated that it was executed by Mr. Schwartzberg in Wilmington, Delaware.

35. The application also indicated that it was executed by Joann A. Rozell in Wilmington, Delaware, on behalf of Wilmington Trust as trustee of the Sham Trust; the Sham Trust was also named as the initial Policy owner and beneficiary.

36. In reliance upon the representations contained in the application documents and other documents and information submitted to Pacific Life in connection with its underwriting of the application, Pacific Life issued the Policy, as a Delaware policy, with number VF51468520.

37. Upon information and belief, and unbeknownst to Pacific Life at the time, at or prior to the time of Policy issuance, a sub-trust to the Sham Trust entered into a non-recourse premium finance agreement with Coventry, whereby Coventry would pay the initial premiums on the Policy, plus whatever additional premiums came due during the two-year contestable period.

38. On or about November 23, 2005, the initial premium under the Policy was paid via a wire transfer in the amount of $534,375 to Pacific Life. Upon information and belief, the premium payment originated from Coventry and/or other persons or entities who lacked an insurable interest in Mr. Schwartzberg's life and were participating in a wager on his life.

39. On or about November 28, 2005, the Policy's delivery receipt was executed in Wilmington, Delaware by Scott A. Huff on behalf of Wilmington Trust as trustee of the Sham Trust (which was the initial owner and beneficiary of the Policy). *See* 18 Del. C. § 2704(g) (explaining Delaware law regarding insurable interest applies to trust-owned life insurance policies delivered in Delaware).

40. The Policy was procured or caused to be procured by Coventry and its agents and others, all of whom lacked an insurable interest in the life of Mr. Schwartzberg, using the same two-year, non-recourse premium finance STOLI scheme that was addressed in detail in *Malkin*, *Van de Wetering*, and *Sol* and which has been illegal in Delaware for well over one hundred years.

41. As a result, the Policy is a void *ab initio* human life wager under Delaware law.

## Post-Issuance Activity

42. On information and belief, as part of the non-recourse premium finance loan agreement used to fund the premiums under the Policy, in or around late-2007 or early-2008, the loan term would have come due and the Policy either could have been relinquished to Coventry in full satisfaction of the loan or sold for an amount in excess of the amount owed under the loan so that the proceeds could be used to repay the loan.

43. On information and belief, around that same time, Mr. Kaye's office implored Mr. Schwartzberg not to relinquish the Policy to Coventry as he claimed that his office had found a buyer for the Policy willing to pay an amount in excess of the amount owed under the loan from Coventry.

44. On information and belief, in reliance on Mr. Kaye's assurances that a buyer for the Policy had been found, Mr. Schwartzberg paid approximately $800,000 to Coventry in satisfaction of the loan and in lieu of relinquishing the Policy.

45. On or around March 13, 2008, Wilmington Trust, on behalf of the Sham Trust, requested that Pacific Life change the owner of the Policy from the Sham Trust to Mr. Schwartzberg, himself, and change the beneficiary of the Policy from the Sham Trust to the Schwartzberg Family Irrevocable Trust (the "Buyout Trust").

46. On information and belief, shortly after repaying the loan from Coventry in reliance on Mr. Kaye's assurances, Mr. Kaye informed Mr. Schwartzberg that the purported buyer Mr. Kaye had lined up was no longer willing to purchase the Policy.

47. On information and belief, after months of trying (unsuccessfully) to find a another buyer for the Policy, the only willing purchaser that could be found was *Coventry*, which ended up purchasing the Policy for approximately $400,000. Thus, after being convinced by Mr. Kaye

not to relinquish the Policy to Coventry, and after instead being convinced by Mr. Kaye to acquire all Policy rights by paying approximately $800,000 to Coventry in satisfaction of the loan, Coventry (approximately just 8 months later) would only pay Mr. Schwartzberg approximately $400,000 for the Policy. Mr. Schwartzberg also had to pay approximately $75,000 in commissions to the broker who facilitated the sale to Coventry, so Mr. Schwartzberg was, in the end, left with a net sale price of only $325,000 resulting in a loss to him of approximately $475,000 (the $800,000 payment to Coventry plus the $75,000 in commissions, less the $400,000 that Coventry was willing to later pay for the Policy).

48. Therefore, Coventry profited from the repayment of the initial non-recourse premium finance loan and managed to purchase the Policy it had initially procured at a discount while Mr. Schwartzberg ultimately took a significant loss.

49. On or around November 10, 2008, Mr. Schwartzberg requested Pacific Life change the beneficiary of the Policy from the Buyout Trust to his children, Shana and Robert Schwartzberg.

50. Just one week later, on or around November 17, 2008, Mr. Schwartzberg requested Pacific Life change the owner and beneficiary of the Policy from himself as the owner and his children as the beneficiaries to Wells Fargo Bank, N.A., as Securities Intermediary.

51. On information and belief, Wells Fargo was, at that time, acting as Securities Intermediary for Coventry.

52. On information and belief, sometime after Coventry's acquisition of the Policy, Coventry sold the Policy to AIG in accordance with a requirements contract between the two entities, whereby AIG would purchase thousands of Coventry's manufactured policies, including the Policy.

53. As a result of the requirements contract, on information and belief, AIG amassed a portfolio containing approximately 7,000 Coventry-manufactured policies totaling approximately $20 billion in face value.

54. On information and belief, in or around December 2016, The Blackstone Group ("Blackstone") purchased an approximately $4.5 billion tranche of life insurance policies from AIG. On information and belief, this tranche included the Policy.

55. On information and belief, Blackstone holds its life insurance investment portfolio(s) through a web of Delaware, Ireland, and Cayman-based corporate entities and partnerships. On information and belief, the ultimate beneficial owner of the Policy is presently Viva Capital 3, L.P. ("Viva").

56. On or around January 18, 2021, Mr. Schwartzberg passed away.

57. On information and belief, a claim for the Policy's death benefit was subsequently made by or on behalf of Wells Fargo as Securities Intermediary for Viva.

58. Subsequently, Pacific Life discovered that the Policy was procured by Coventry through its STOLI scheme and that, under Delaware law, the Policy lacked an insurable interest prior to and at its inception and that the Policy was merely a wager on Mr. Schwartzberg's life.

59. During its claim investigation, Pacific Life also learned of the facts and circumstances surrounding the false promises made to Mr. Schwartzberg in or around 2008 about the availability of a buyer for the Policy, and of the losses sustained by Mr. Schwartzberg because he was induced to participate in Coventry's STOLI program.

60. Pacific Life now seeks a declaration that the Policy is void *ab initio* because it was procured as a human life wager and otherwise lacked insurable interest under Delaware law.

# FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT – <u>ILLEGAL HUMAN LIFE WAGERING CONTRACT</u>

61. Pacific Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

62. The Policy was applied for and signed in Delaware by a Delaware statutory trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Sham Trust, Wilmington Trust, at its offices in Wilmington, Delaware. The Policy is governed by Delaware law.

63. The Delaware Constitution provides that "[a]ll forms of gambling are prohibited in this State except [those explicitly set forth in the statute]." Del. Const. Art. II, § 17. Moreover, the Delaware Supreme Court has addressed the issues associated with life insurance policies used to wager on the death of insureds and has held that, under Delaware law, such policies are mere wagering contracts and are void *ab initio*. *Price Dawe*, 28 A.3d at 1067-68.

64. As set forth herein, the Policy was, from the outset, procured or caused to be procured by Coventry and its agents and others and was intended as a wager on the life of Mr. Schwartzberg. Stranger investors were wagering on Mr. Schwartzberg's life and hoping to trigger a secondary market cash-in on the Policy's $10 million death benefit.

65. Accordingly, Pacific Life seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated the Delaware Constitution and the public policy of Delaware, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

## SECOND CAUSE OF ACTION
## DECLARATORY JUDGMENT –
## <u>LACK OF INSURABLE INTEREST</u>

66. Pacific Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

67. The Policy was intentionally structured to be a "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 Del. C. § 2704(e)(4). Because the Policy was delivered to the place of business of the trustee of the Sham Trust, Wilmington Trust, at its offices in Wilmington, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location." 18 Del. C. § 2704(g).

68. Under Delaware law, a valid and legitimate insurance trust can have a valid insurable interest in the life of the insured. *See* Del. C. § 2704(c)(5).

69. However, because the Sham Trust was an illegitimate cover for the wager on Mr. Schwartzberg's life, the Sham Trust lacked any insurable interest in the life of Mr. Schwartzberg. Accordingly, no insurable interest existed at the time of issuance of the Policy, and the Policy is void *ab initio* for lack of insurable interest.

70. Additionally, the Policy was applied for, paid for, and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Accordingly, the Policy is void *ab initio* for lack of an insurable interest.

71. Therefore, Pacific Life seeks, and is entitled to, a declaratory judgment that the Policy lacked insurable interest because it was procured or caused to be procured by and for the benefit of strangers without any insurable interest under Delaware law.

WHEREFORE, Pacific Life respectfully requests the entry of judgment by this Court as follows:

a. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Mr. Schwartzberg;

b. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

c. Declaring that because the Policy is void *ab initio* it never existed;

d. Declaring that because the Policy is void *ab initio*, the Court will leave the parties to this illegal contract as it finds them, permitting Pacific Life to retain the premiums paid on the Policy, or, in the alternative, declaring that Pacific Life may retain some or all of the premiums paid on the Policy to effectuate an offset with respect to Pacific Life's costs and losses associated with the Policy;

e. Awarding Pacific Life attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

f. Awarding Pacific Life any further relief this court deems appropriate.

Dated: March 23, 2021

> By: *s/ Chad E. Kurtz*
> Chad E. Kurtz, Esq.
> COZEN O'CONNOR
> 1200 19th St., NW, 3rd Fl.
> Washington, D.C. 20036
> Telephone: (202) 463-2521
> Facsimile: (202) 640-5939
> Email: ckurtz@cozen.com
> Md. State Bar No. 14102
>
> Michael J. Miller (*pro hac vice to be filed*)
> Gregory J. Star (*pro hac vice to be filed*)
> Philip J. Farinella (*pro hac vice to be filed*)

COZEN O'CONNOR
1650 Market St., Suite 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff,*
*Pacific Life Insurance Company*
