IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

PACIFIC LIFE INSURANCE CO.,              *

            Plaintiff              *

            v.                    *     Civil Case No. 8:21-cv-00737-PJM

WELLS FARGO BANK, NA,                    *

            Defendant              *

**MEMORANDUM OPINION AND ORDER**

This is a case concerning the alleged illegal generation of a life insurance policy.  Pending before the Court is Plaintiff Pacific Life Insurance Company's Motion to Compel the production of documents from Defendant Wells Fargo Bank, NA, and Non-Parties Viva Capital 3, L.P., Blackstone Tactical Opportunities Advisors, LLC, and Preston Ventures, LLC (hereinafter Defendant).  ECF No. 84.[1]  The sole remaining issue from the pending Motion is Plaintiff's request that the Court compel Defendant to produce certain communications protected by the attorney-client privilege on account of Defendant's alleged "at-issue waiver."  Given the unique nature of the factual allegations in this case, the test applicable to Wells Fargo's counter-claim for unjust enrichment under Delaware law, and the responses of Defendant's witness during his deposition, the Court finds that a limited production for the purposes of an in-camera review is appropriate.  Accordingly, for these reasons and the reasons discussed below, Plaintiff's Motion is granted, in part, and denied, in part.

---

[1] As discussed below, the Court recognizes the differing standards governing a request for the production of documents and a subpoena to a non-party.  However, both Wells Fargo and Non-Parties have filed joint briefings which turn on a singular legal determination of whether privileged communications must be produced.

**BACKGROUND**

The facts of this case are recounted in detail in the Court's Memorandum Opinion of April 24, 2023.  ECF No. 113.  Accordingly, the Court will focus on the facts relevant to the pending Motion.

On October 25, 2021, Wells Fargo filed a counterclaim against Plaintiff, alleging that if the Schwartzberg Policy (hereinafter "the Policy") was found to lack a valid insurable interest, Plaintiff would be obligated to return the premiums related to the Policy, including those Wells Fargo had paid on Viva Capital 3 L.P. ("Viva")'s behalf.  ECF No. 34, at 22-26.  Importantly for the purpose of the pending Motion, Wells Fargo specifically alleged:

> Separately, Securities Intermediary's customer, the [Defendant], did not blind itself to red flags before it acquired the Policy on the tertiary market. Securities Intermediary's customer did sophisticated due diligence and concluded that there was not a significant risk that Pacific — which has never been in the business of seeking to invalidate its life insurance policies through litigation — would challenge the Policy's validity. And if Pacific did challenge the Policy, Securities Intermediary's customer concluded that there was not a significant risk that a Court would agree that the Policy was invalid, and therefore, Pacific would be excused from paying the Policy's death benefit.

*Id.*, at ¶ 48; *see also id.*, at ¶ 42 ("After the current beneficial owner of the Policy acquired the beneficial interest in the Policy, Securities Intermediary (on behalf of its customer) has continued to pay premiums to Pacific *in good faith* through Dr. Schwartzberg's death." (emphasis added)); *id.*, at ¶ 49 ("Pacific is also far more culpable than Securities Intermediary (and its customer)").

On November 8, 2022, Plaintiff filed a Motion to Compel the Production of Documents and Interrogatory Responses from Defendant.  ECF No. 84.  On January 6, 2023, the parties completed briefing the pending Motion.  ECF Nos. 92, 98.

On May 8, 2023, the Court held a hearing on the pending Motion, during which the Court resolved several issues that Plaintiff had raised.  ECF No. 117.  However, the Court deferred ruling on the parties' main dispute – whether Defendant was obligated to produce certain communications it had with counsel, reasoning that the production of attorney-client communications should be a matter of last resort.  ECF No. 118.  Accordingly, to the extent that Plaintiff could obtain the information needed to defend against Wells Fargo's counterclaim through other means, it should.  Specifically, the Court asked whether Plaintiff had attempted to depose a representative of Viva to see whether the representative, in fact, asserted the attorney client privilege in response to questions related to Wells Fargo's basis for its unjust enrichment claim and Wells Fargo's assertions of good faith in its pleadings.  In response to Plaintiff's answer that it had not, the Court ordered Plaintiff to complete this deposition and granted Plaintiff leave to renew its motion if it was unable to garner sufficient evidence to defend against Wells Fargo's unjust enrichment claim.  *Id.*

On May 31, 2023, Plaintiff conducted a 30(b)(6) deposition of Jon Nelson, the CEO of Preston Ventures LLC, the investment advisor to Viva, which is Wells Fargo's customer in this case.[2]  ECF No. 128-2, at 5.  During the deposition, Mr. Nelson made several statements relevant to the resolution of the pending Motion.  Specifically, he testified that the Policy was one of 450 policies that Viva purchased in 2017.  *Id.* at 7.

Mr. Nelson stated that although Viva had some information that the policy was part of a premium finance program, which would indicate that there was not an insurable interest, the information was not dispositive.  *See id.* at 24-25 ("the evidence was just as strong that it wasn't a

---

[2] Mr. Nelson appeared at the deposition on behalf of Viva Capital 3 LP, Preston Ventures, LLC, and Blackstone Tactical Opportunities Advisors, LLC.  ECF No. 128-2, at 5.

LaSalle premium financed through the PFIC program policy as it was.").  Plaintiff attempted to delve into the basis for this statement.  Plaintiff asked whether Preston Ventures – an investment advisor that assists in the management of Viva – was told that the Policy was in-part funded through a premium finance program administered by American Insurance Group, Inc.  *Id.* at 25.  Mr. Nelson responded that he did not recall whether or not they were informed of such.  *Id.*

During the deposition, Mr. Nelson stated that Preston, as well as Blackstone Tactical Opportunities Advisors, LLC – a separate entity which, with Preston, manages Viva, conducted due diligence both on the portfolio level, as well as on the individual Policy at issue in this case. *Id.* at 26.  The due diligence for Preston and Blackstone, and in essence Viva, was done by lawyers at the law firm of Schulte, Roth and Zabel, who Viva hired in March 2017 to assess the risk that the policies in the portfolio that the Policy was part of had insurable interests supporting them.  *Id.* at 27.

Plaintiff sought to inquire further into the role that the legal advice played in Viva's determination that the Policy was supported by an insurable interest.  *Id.*  Defendant's counsel instructed Mr. Nelson not to answer on the basis of privilege.  *Id.*  Mr. Nelson similarly refused to answer a question as to whether Viva reached a conclusion "about the level of interest risk that the Schwartzberg policy carried" because he could not answer the question without bringing into his answer "direct communication and advice from counsel."  *Id.* at 28.  Plaintiff followed that question by asking whether "everything that Viva relied upon in connection with the extent to which the policy carried insurable interest risk came either directly from counsel or derived from privileged advice from counsel[.]"  *Id.*  After initially refusing to answer, Mr. Nelson confirmed that neither Preston nor Viva conducted any analysis that was separable from the legal analysis which Viva's counsel conducted.  *Id.*  Accordingly, he would refuse to answer any questions

regarding any conclusion it reached as to whether the Policy, or any other individual policy, was supported by an insurable interest, *id.* at 29; *see also id.* at 29 ("When you're talking of specific policies, I cannot . . . extract the legal advice of counsel from the answer to whether there was or wasn't insurable interest risk associated with that Policy."), because any analysis associated with an individual policy would require a lawyer's analysis. *Id.* ("any individual policy with the facts and circumstances associated with that policy may be very unique and would require a lawyer to evaluate individualized insurable interest risk."). However, at the portfolio level, Mr. Nelson admitted to considering the fact that the portfolio had been subject to a limited number of legal challenges. *Id.* at 29; *see also id.* at 29-30 ("The business will use reasonable judgment when evaluating litigation risk broadly . . . we very much were focused on the fact that literally thousands and thousands of death benefits had been collected by AIG across their entire portfolio where no litigation had been brought. . . . And that, for sure, was something that we . . . talked about . . . as a good fact in why we should consider this a good portfolio to own . . . and invest in.").

Upon further questioning by Plaintiff, Mr. Nelson again emphasized what Viva did on a portfolio-wide basis as opposed to relating to any individual policy, including the Policy at issue in this case:

> We, on the business side, did evaluate the history of litigation that AIG had experienced on literally thousands of death claims as one of the data points that we would draw on about the likelihood of future litigation, as history is the best predictor of the future. But . . . it becomes much more complex and nuanced when you start to evaluate it within the context of what the lawyers told us. And as I've already testified, anything that the lawyers told us about any individual policy, I cannot answer, based on advice from counsel.

*Id.* at 30; *see also id.* at 33 ("[Mr. Nelson] has given you testimony that that any such assessment on an individual-policy basis is privileged."). While at one point towards the end of the deposition, Mr. Nelson stated facts that, "looking back," evidenced that the Policy was supported by an

insurable interest, *id.* at 65, he clarified that these facts would only have been used to assess whether a portfolio as a whole should be purchased.  *See id.* at 66 (confirming that evidence related to Pacific Life's acceptance of premiums and whether a policy had been through multiple changes of ownership was used to assess policies on a portfolio-wide basis.).  Mr. Nelson testified that he, and by extension Viva, did not have any specific recollection of what led Viva to ultimately clear the Policy at issue in this case for purchase.  *Id.* at 56.  Finally, relevant to the pending Motion, Mr. Nelson confirmed that any advice Viva may have received would have been received by email. *Id.* at 31.

On July 13, 2023, Plaintiff filed a second Memorandum in support of its Motion to Compel, renewing its request that the Court compel production of the attorney-client privileged communications as it relates to the advice Defendant received regarding the Schwartzberg policy. ECF No. 128.  The parties have since completed briefing the pending Motion, including an additional Opposition and Reply.  ECF Nos. 144, 151.

## LEGAL STANDARD

Federal Rule of Civil Procedure 37(a) "authorizes the basic motion for enforcing discovery obligations."  CHARLES ALAN WRIGHT, ET AL., 8B FED. PRAC. & PROC. CIV. § 2285 (3d ed. 1998).  Where a party fails to answer a request for production of documents or an interrogatory, the Rule allows the opposing party to move for an order compelling an answer. Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv).  The moving party must certify in the motion that it has conferred, or attempted to confer, in good faith with opposing counsel in an effort to obtain the desired material without court involvement.  Fed. R. Civ. P. 37(a)(1).  District courts enjoy substantial discretion in managing discovery, including granting or denying motions to compel.  *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995).

Regarding the request to compel subpoenaed documents, the Court must begin by reviewing Plaintiff's subpoena under the relevancy standards set forth in Rule 26(b). *Crete Carrier Corp. v. Sullivan and Sons, Inc.*, No. ELH-21-0328, 2022 WL 1203652, at *15 (D. Md. Apr. 21, 2022). Pursuant to Fed. R. Civ. P. 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

However, a subpoena to a third party which "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden," must be quashed or modified. Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). As explained in *Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 439 (D. Md. 2012), "[w]hether a subpoena subjects a witness to undue burden within the meaning of Rule 45[(d)](3)(A)(iv) usually raises a question of the reasonableness of the subpoena," an analysis that requires "weighing a subpoena's benefits and burdens" and "consider[ing] whether the information is necessary and whether it is available from any other source." (citing 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2463.1 (3d ed. 2008)). This inquiry is "highly case specific" and involves "an exercise of judicial discretion." *Id.* "The burden of proving that a subpoena is oppressive is on the [responding party]." *Fleet Bus. Credit, LLC v. Solarcom, LLC*, No. Civ.AMD05-901, 2005 WL 1025799, at *1 (D. Md. May 2, 2005) (internal quotation marks omitted).

**ANALYSIS**

Although Defendant correctly analyzes the pending Motion as being subject to New York law, it incorrectly cabins the applicable precedents thereunder and, as a result, their application in this particular case.  By pursuing a claim for unjust enrichment – which, under Delaware law, requires an inquiry into Defendant's actual knowledge; specifically pleading that it acted in good faith; and then testifying that any analysis it may have been done was subject to the attorney client privilege and that it lacks any recollection of any basis for decision it may have had separate and apart from that provided by counsel, Defendant has made production of these communications not merely relevant, but necessary to this case.

## I.      Choice of Law

Although the parties agree that the question of privilege in this case is governed by state law, they disagree as to the law of which state applies.  Pursuant to Federal Rule of Evidence 501, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501.  Likewise, as this Court has held, "the law of the forum state in a federal diversity action controls the applicability of a claim of privilege."  *Saint Annes Dev. Co., LLC v. Trabich*, No. WDQ–07–1056, 2009 WL 324054, at * 2 (D. Md. Feb. 9, 2009).  In the instant case, that is the law of Maryland.  However, as "this Court in *Hill v. Huddleston*, 263 F.Supp. 108 (D. Md. 1967), predicted, in the absence of authoritative Maryland precedent, . . . Maryland courts . . . apply the law of the state that has the most significant relationship with the communication to a claim of privilege asserted at a deposition." *Id.*; *see also Bogard Const., Inc. v. Oil Price Info. Serv., LLC*, 604 F. Supp. 3d 895, 901 (N.D. Cal. 2022) ("Under Maryland choice of law rules, the Court looks to the Second Restatement of Conflict of Laws for privilege questions. . . . Under the Second Restatement, the Court applies the law of the state with the most significant relationship to the communications at issue.").  Defendant asserts and Plaintiff does not dispute

that: 1) Maryland does not have authoritative precedent on the relevant question; and 2) the state with the most significant relationship to the question of privilege in this case is New York. *See* ECF No. 144, at 5; ECF No. 151, at 2.

Plaintiff argues that because Defendant's counterclaim for unjust enrichment is arguably governed by Delaware state law, pursuant to Federal Rule of Evidence 501, the question of privilege must be governed by the law of the same state. ECF No. 85, at 6. Plaintiff's argument reads into the federal rule an additional requirement beyond its text. While Rule 501 specifies that questions of privilege shall be governed by state law, nowhere in the Rule does it require that it be the same state law that governs the underlying claim. Nor do the cases that Plaintiff cites support such a rule. Although they involved circumstances in which courts applied the same state law to both the plaintiff's substantive claims and the questions of privilege in those cases, in none of those cases did the court hold that the determination of the former was determinative as to the latter – as Plaintiff argues. *See* ECF No. 98, at 3 (citing *ContraVest Inc. v. Mt. Hawley Ins. Co.*, No. 20-1915, 2021 WL 4782687 (4th Cir. 2021); *Wells v. Liddy*, 37 Fed. App'x 53 (4th Cir. 2002)). In many cases, the two questions will be subject to the law of the same state, as the rule of decision will come from the forum state. *See* ECF No. 98, at 3 (citing *Gresser v. Wells Fargo Bank, N.A.*, No. CCB–12–0987, 2014 WL 293518, at *1 (D. Md. Jan. 24, 2014) ("Maryland law, which supplies the rule of decision, also governs the applicability of the attorney-client privilege."); *Cont'l Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 765 (D. Md. 2008) (same)). However, in this case, if Delaware law governs the underlying claim, as Plaintiff argues, the two questions will be subject to two separate state's laws.

Accordingly, in light of this Court's prior rulings, the lack of precedent to the contrary, and the undisputed connection between the privileged communications and the state of New York, New York law applies to the present privilege-related dispute.

## II.    At Issue Waiver

Under New York law, it is well-established that:

> "At issue" waiver of privilege occurs where a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and application of the privilege would deprive the adversary of vital information.

*Deutsche Bank Tr. Co. v. Tri-Links Inv. Tr.*, 837 N.Y.S.2d 15, 23 (N.Y. App. Div. 2007).  New York courts have held that mere relevance to a claim at issue is not sufficient to waive the privilege. *Id*.  Rather, "at issue" waiver occurs: 1) "when the party has asserted a claim or defense that he intends to prove by use of the privileged materials[,]" *id.*; *2138747 Ont. Inc. v. Lehman Brothers Holdings, Inc.*, 176 N.Y.S.3d 636, 637 (N.Y. App. Div. 2022); or 2) where production of the materials is necessary for the plaintiff to prove its claim or for the defendant to defend against a claim, *Vill. Bd. of Vill. of Pleasantville v. Rattner*, 515 N.Y.S.2d 585, 586 (N.Y. App. Div. 1987); *Tupi Cambios, S.A. v. Morgenthau*, 989 N.Y.S.2d 572, 576 (Sup. Ct. N.Y. Cnty. 2014); *William Tell Sers., LLC v. Cap. Fin. Plan., LLC*, 999 N.Y.S.2d 327, 333 (Sup. Ct. Rensselaer Cnty. 2014); *In re Bank of New York Mellon*, 977 N.Y.S.2d 560, 564 (Sup. Ct. N.Y. Cnty. 2013); *Neogenix Oncology, Inc. v. Gordon*, CV14-4427(JFB)(AKT), 2015 WL 13735953, at *7 (E.D.N.Y. Jul. 31, 2015); *Leviton Mfg. Co., Inc. v. Greenberg Traurig LLP*, No. 09Civ.8083(GBD)(THK), 2010 WL 4983183, at *8 (S.D.N.Y. Dec. 6, 2010); *Chin v. Rogoff & Co., P.C.*, No. 05Civ.8360(NRB), 2008 WL 2073934, at *5 (S.D.N.Y. May 8, 2008).  *See also Securitized Asset Funding v. Canadian Imperial Bank of Com.*, 138 N.Y.S.3d 309, 310 (N.Y. App. Div. 2021) ("This is unlike [a] case . .

. in which this Court upheld an at-issue waiver, despite the defendant's avowed intention not to use privileged communications and documents in its defense, because the plaintiff was required to use them to prove its claim"); *Metro. Bridge & Scaffolds Corp. v. N.Y. City Hous. Auth.*, 92 N.Y.S.3d 248, 250 (N.Y. App. Div. 2019) ("The court correctly found that having placed the knowledge of its law department at issue, NYCHA waived attorney-client privilege with respect to the subject documents."); *Nomura Asset Cap. Corp. v. Cadwalader, Wickersham & Taft LLP*, 62 A.D.3d 581, 582 (N.Y. App. Div. 2009) ("defendant fails to show that any such communications are necessary to either plaintiff's claim or its defense"); *Goetz v. Volpe*, 812 N.Y.S.2d 294, 296 (Sup. Ct. Nassau Cnty. 2006) ("New York courts have recognized a broad interpretation of the at issue theory of waiver.  They have held that where an individual affirmatively places the underlying conduct at issue by bringing a civil suit, the courts have consistently held that the statutory protection is waived." (internal citations and quotation marks omitted)); *DH Holdings Corp. v. Marconi Corp. PLC*, 809 N.Y.S.2d 404, 407 (Sup. Ct., N.Y. County 2005) ("Here, . . . the plaintiffs unquestionably must demonstrate that the settlement and fees were reasonable, withholding the entirety of all the documents specified in plaintiffs['] privilege log would deprive the defendants of vital information, necessary to challenge this claim. The heart of this matter is to determine if the settlement was appropriate, and if so, was it reasonable.  Inquiries that, of necessity, place these documents at issue."); *Allen v. W. Point-Pepperell Inc.*, 848 F.Supp. 423, 430 (S.D.N.Y. 1994) ("Defendants can show neither that the subject of the privileged communications is critically relevant to the issue of plaintiffs' delay in attacking the releases, nor that absent disclosure of the privileged communications there would be no other source of direct proof of laches.").  Where the party holding the privilege does not intend to rely on the documents, the party arguing that the privilege has been waived must demonstrate

11

that production of the documents is necessary.  *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 107 A.D.3d 451, 452 (N.Y. App. Div. 2013) ("Although the privileged information sought by defendant is relevant to plaintiff's fraud claims, plaintiff disavows any intention to use privileged materials and defendant fails to show that the materials are necessary to determine the validity of the claims or to its defense against them.") (internal citations omitted).  "The New York Court of Appeals has adopted the Second Circuit's view that 'to what extent waiver has occurred is inherently factual and turns on case-by-case considerations of "fairness."'" *Leviton Mfg. Co.*, 2010 WL 4983183, at *4 (quoting *People v. Kozlowski*, 869 N.Y.S.2d 848, 863 (2008)); *see also Gen. Elec. Co. v. APR Energy*, 19-CV-3472(VM)(KNF), 2020 WL 2061423, at *8 (S.D.N.Y. Apr. 29, 2020) (same).

Although Defendant asks the Court to disavow the second category of cases, its argument ignores a significant line of caselaw allowing for the production of privileged communications even if a party does rely on them.[3]  As another federal district court stated:

> The First Department's statement in *Deutsche Bank* that at issue waiver occurs when the party has asserted a claim or defense that he intends to prove by use of the privileged materials did not purport to identify the exclusive basis for "at issue" waiver under New York law.  As described above, the First Department's description of the "at issue" waiver was broader.  Subsequent decisions of New York courts have not construed the *Deutsche Bank* decision in the manner that [the opposing party] has suggested. . . . Accordingly, under New York law, there are no exclusive requirements for finding an implied waiver.

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09Civ.3255, 2012 WL 2568972, at *6 (S.D.N.Y. July 3, 2012) (internal citations and quotation marks omitted); *Bowne of N.Y.C., Inc. v.*

---

[3] However, cases in which a party relies on privileged communications will be the majority of cases involving an at-issue waiver.  *Windsor Sec., LLC v. Arent Fox LLP*, 273 F.Supp.3d 512, 519 (S.D.N.Y. 2017).

*AmBase Corp.*, 150 F.R.D. 465, 488 (S.D.N.Y. 1993) ("As summarized by the New York courts,

a waiver may be found where invasion of the privilege is required to determine the validity of the

client's claim or defense and application of the privilege would deprive the adversary of vital

information.") (internal citations and quotation marks omitted); *Sparrow Fund Mgmt. LP v.*

*MiMedx Grp., Inc.*, No. 18-cv-4921(PGG)(KHP), 2021 WL 1930294, at *5 (S.D.N.Y. May 13,

2021) ("in some cases, even when a party asserts that it has not relied on advice of counsel, such

advice may have been impliedly placed in issue where the party's state of mind, such as his good

faith belief in the lawfulness of his conduct, is relied upon in support of a defense.").

Given the nature of the relevant test governing Wells Fargo's counterclaim, Defendant's

actual knowledge is central to the resolution of this case.[4]  Pursuant to the Delaware Supreme

Court's decision in *Geronta Funding v. Brighthouse Life Ins. Co.* (hereinafter "*Seck*"), the court

applies a "fault-based analysis as framed by the Restatement as the test to determine whether

premiums should be returned when a party presents a viable legal theory, such as unjust

---

[4] Although Defendant disputes whether Florida law governs Plaintiff's claim that the policy is
void, Defendant does not dispute that its counter-claim for unjust enrichment – which would
require that the Court first find that the policy is void – is governed by Delaware law.  *See* ECF
No. 92, at 15 ("At summary judgment, the Court will have to decide whether the 'last act' to form
the Policy occurred in Delaware, as Pacific argues, or whether it occurred elsewhere, such as
Florida, the state where virtually everything leading to the Policy's inception took place (which
would mean the Policy is valid and incontestable)."); *see id.* ("If the Court holds that Delaware
law is controlling on policy validity and if the Court further holds that the Policy is void *ab initio*
under Delaware law, then it is true Delaware law – and the *Seck* test – will apply to the premium-
return issue.").  Further, beyond generally noting that it contests whether Delaware law governs
the claims in this case, Defendant fails to present any argument as to what the applicable test should
be governing Wells Fargo's counterclaim.  *See id.* at 14-15.  Finally, to the extent that Defendant
disputes that Delaware law governs the claims in this case, it does so only to highlight the error of
Plaintiff's argument that Delaware privilege law should apply to this case.  *See id.* at 15
("Securities Intermediary highlights this issue to underscore why it would be nonsensical to apply
Delaware's privilege law based on Pacific's incorrect assertion that '[t]here is no dispute that
Delaware law governs the question of the Policy's validity or Wells Fargo's counterclaim for
unjust enrichment.'" (internal citations omitted)).

enrichment, and seeks the return of paid premiums as a remedy." 284 A.3d 47, 50 (Del. 2022).

Specifically, the court considers whether:

> (1) there would be a disproportionate forfeiture if the premiums are
> not returned; (2) *the claimant is excusably ignorant*; (3) the parties
> are not equally at fault; (4) the party seeking restitution did not
> engage in serious misconduct and withdrew before the invalid
> nature of the policy becomes effective; or (5) the party seeking
> restitution did not engage in serious misconduct, and restitution
> would put an end to the situation that is contrary to the public
> interest.

*Id.* at 72 (emphasis added); *see also id.* at 72-73 ("A court analyzing the exceptions outlined in

Section 198 should consider the following questions: whether the party knew the policy was void

at purchase or later learned the policy was void; whether the party had knowledge of facts tending

to suggest that the policy is void; whether the party procured the illegal policy; whether the party

failed to notice red flags; and whether the investor's expertise in the industry should have caused

him to know or suspect that there was a substantial risk that the policy it purchased was void.").

Accordingly, what Defendant actually knew as to whether an insurable interest supported the

Policy is not merely relevant, but central to Wells Fargo's claim for unjust enrichment.[5]

The deposition of Mr. Nelson clarified that the only direct evidence of Defendant's actual

knowledge regarding the Policy were communications from counsel as to whether an insurable

interest supported the Policy.  As Mr. Nelson testified, the only due diligence regarding the Policy

was conducted by attorneys and then communicated to Wells Fargo's customer Viva via privileged

communications.  While there may have been other due diligence conducted, any such diligence

was conducted on a portfolio-wide basis.   Accordingly, as Mr. Nelson testified, Viva's

---

[5] Defendant, in response, emphasizes that Plaintiff's knowledge is also important to the case.
While this may be the true, it does not decrease the importance of Defendant's knowledge to the
resolution of this case.

determination as to the Policy could not be separated from the work of its attorneys.  Further, to the extent that Viva had any information regarding its knowledge of the Policy at the time, separate and apart from its attorneys' conclusions, Mr. Nelson testified that he has no recollection of such.

Defendant's identification of facts on which it intends to rely does not direct a different result.  *See* ECF No. 144, at 17-18; ECF No. 92, at 18-19.  While there may have been facts that may have supported Defendant's belief that the Policy had an insurable interest, focusing on these facts alone ignores the relevant question, which asks not whether Defendant's belief would have been reasonable, but what Defendant actually knew at the time it purchased the policy.[6]  The facts which Defendant identifies, are, at best, only indirect evidence of Defendant's actual knowledge as to the nature of the Policy.  Further, beyond their limited relevance under the applicable test, their persuasiveness, as noted above, is weakened by Mr. Nelson's later admission that these facts were used to make assessments on a portfolio-wide basis; his prior admission that he did not recall relevant facts regarding the nature of the Policy, separate and apart from those which were intertwined with legal advice; and the admittedly central role that the legal due diligence played in Defendant's conclusion as to the nature of the Policy.[7]

Were this not enough, Wells Fargo, in pleading its counterclaim, has specifically alleged that it lacked knowledge regarding the nature of the Policy.[8]  *See also* ECF No. 85-2, at 43

---

[6] Defendant's reliance on the fact that Mr. Nelson believes the Policy is valid, ECF No. 144, at 22, again ignores relevant question – what Defendant knew when it purchased the Policy.

[7] Additionally, the transcript of Mr. Nelson's deposition is unclear as to whether Mr. Nelson was testifying as to facts that formed Defendant's actual knowledge at the time or looking back support the conclusion that the Policy was supported by an insurable interest.  *See* ECF No. 128-2, at 65 (testifying that Viva had "so much evidence" that the policy was valid and that the "preponderance of evidence . . . even today, looking back at this policy, this was a valid policy.").

[8] As noted above, Defendant does not dispute that its unjust enrichment claim would be governed by Delaware law, but even if it did, it has conceded the importance of the issue by pleading its counterclaim in such a manner that its actual knowledge is central to the resolution of the claim.

(admitting that Wells Fargo has pled disproportionate forfeiture, excusable ignorance, and comparative culpability).  Accordingly, it is not merely the test in *Seck*, but Wells Fargo's own pleadings which place the privileged communications at issue.  New York courts have ordered the production of privileged communications where a party refusing disclosure makes such allegations.  *See William Tell Sers., LLC*, 999 N.Y.S.2d at 333 ("Although plaintiff's complaint alleges that Roth and Avdoyan signed the non-compete agreements in January 2011 . . . , Roth and Avdoyan maintain that the agreements were signed during the meeting with Ventura held in the office of Smith Hoke, PLLC on February 2, 2011. . . . In the Court's view, there has been an implied or "at issue" waiver of the attorney-client privilege."); *Bolton v. Weil, Gotshal & Manges LLP*, No. 602341/03, 2004 WL 2239545, at *6 (Sup. Ct. N.Y. Cnty. 2004) ("Such communications may bear directly on Bolton's allegations that he was not informed of the potential conflict of interest under the indemnity provisions arising out of WGM's joint representation, which may impact on the proof regarding Bolton's burden to show that "but for" WGM's breach of fiduciary duty he "would have prevailed in the underlying matter or would not have sustained ascertainable damages.").  As noted above, these allegations are not ancillary, but central to Wells Fargo's counterclaim.  *See Ambac Assur. Corp. v. DLJ Mortg. Cap., Inc.*, 92 A.D.3d 451, 452 (N.Y. App. Div. 2012) (refusing request to order production of privileged communications where "All references to the 'third-party consultant' in their complaint could be stricken and it would still stand.  Mention of a third-party consultant was not made as an element of the claim, but as a good-faith basis for the allegations made.").

　　　　This case mirrors those in which courts have found that disclosure of privileged communications was appropriate even though the party holding the privilege did not rely on them. For example, in *Chin v. Rogoff*, the "[p]laintiffs' claims for damages depend[ed] entirely on the

presence of a causal link between [the defendant's] alleged erroneous advice and the plaintiffs' ultimate decision to execute that release." 2008 WL 2073934, at *6. However, defendant alleged that after he provided the advice, plaintiff's counsel provided contrary advice. *Id.*, at *2, *6. The court reasoned that causation was central to the case and whether counsel's advice broke the chain of causation could only be determined through production of the underlying privileged communications. *Id.*, at *6. *See also Tupi Cambios*, 989 N.Y.S.2d at 577 (ordering production of privileged communications where "plaintiffs' actual notice and/or knowledge with respect to the forfeiture action against BHSC and the restraint of their funds has been placed at issue. . . . The specifics of what plaintiffs knew and when they knew it are key to the viability of their remission causes of action[.]"). Likewise, here, Wells Fargo has alleged that Viva and Wells Fargo were unaware of the lack of an insurable interest supporting the Policy. It is undisputed that Viva asked its counsel to conduct due diligence on this precise issue. If Defendant in fact received a conclusion that the Policy lacked an insurable interest, it directly undercuts its claim that it lacked knowledge of the nature of the Policy. However, the only means of conclusively determining such is production of the privileged communications. Accordingly, as in *Chin*, there "are dispositive issues here" that "cannot be adequately resolved without invasion of the privilege." 2008 WL 2073934, at *6.

This case is distinguishable from one in which the applicable legal test applies an objective standard. In such a case, production of the privileged communications is usually not necessary, for what Plaintiff actually knew is only ancillary. *See Windsor Sec., LLC v. Arent Fox LLP*, 273 F.Supp.3d 512, 520 (S.D.N.Y. 2017) ("the question before the jury will be whether defendants failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession. . . . Defendants are not "required" to learn what new counsel thought of

defendants' performance in order to address this issue."); *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 502-03 (S.D.N.Y. 2009) ("fairness does not require that Parneros have access to the attorney-client communications of Barnes & Noble . . . because there is ample objective evidence that Parneros may use in his effort to meet the [grossly irresponsible] standard."); *Berkley Custom Ins. Managers v. York Risk Servs. Grp., Inc.*, 18-cv-9297(LJL), 2020 WL 5439636, at *3 (S.D.N.Y. September 10, 2020) ("The standard York will have to satisfy is an objective one.  It does not matter whether York changed its position based on Wade Clark's advice or whether Wade Clark properly advised Berkley or not regarding the applicability of New York Insurance Law[.]"); *Leviton Mfg. Co.*, 2010 WL 4983183, at *5 (denying motion to compel privileged communications where propositions needed for defense "can be established by reference to objective facts and law. Leviton's state of mind or advice of counsel is not in issue."); *Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp.*, No. 00Civ.9212(DF), 2002 WL 31729693, at *16 (S.D.N.Y. Dec. 5, 2002) ("the reasonableness of the attorneys' fees actually incurred in a case can 'in all probability . . . be determined . . . by examination of attorney time records and documents filed in court.'" (internal citations omitted)).  In this case, the facts that were known to Defendant, while relevant, are not determinative as to the issue.  Rather, the question is what Defendant actually knew at the time it purchased the Policy.  In such cases, where a party's actual knowledge is at issue, and that actual knowledge was based largely on the advice of counsel, courts have ordered production.  *See Valutron, N. v. Pennie & Edmonds*, 800 N.Y.S.2d 358, 2004 WL 3093273, at *2 (Sup. Ct. N.Y. Cnty. 2004) ("Since plaintiffs assert that the patent infringement litigation against NCR would have been commenced earlier and would not therefore have been dismissed for laches had P & E properly advised them about the problem, P & E may be entitled to show that its failure to so advise or warn plaintiffs was not the proximate cause of plaintiffs' damages because, even if it had

raised the issue with plaintiffs, they were already familiar with the possible applicability of the laches doctrine, were aware of the risks attendant in delaying the commencement of their patent infringement action against NCR and would nevertheless have knowledgeably exposed themselves to that risk in order to use the time to obtain the necessary funding."); *MBIA Ins. Corp.*, 2012 WL 2568972, at *7 (ordering production of privileged communications where the privilege holder "has made factual assertions about his 'understanding' of the Master Agreement as well as what was 'intended' by the parties in the Agreement."); *Meskunas v. Auerbach*, No. 17Civ.9129(VB)(JCM), 2020 WL 7768486, at *5 (S.D.N.Y. Dec. 30, 2020) ("Since Plaintiffs' malpractice claim rests on the supposition that they relied on Defendants' negligent advice, 'legal advice they received from any other lawyers on that subject relates to the reasonableness of [Plaintiffs'] reliance [on Defendants' advice] and is not subject to the attorney/client privilege.'").

Finally, this is not a case in which Viva was "required to waive attorney-client privilege to defend against liability." *Scott v. Chipotle Mexican Grill, Inc.*, 67 F.Supp.3d 607, 617 (S.D.N.Y. 2014); *see also* ECF No. 92, at 28. Wells Fargo, on behalf of Viva, affirmatively advanced a claim for unjust enrichment separate from and in addition to its defenses, as well as its separate counter claim for breach of contract. ECF No. 34, at 22. Furthermore, as discussed above, this case is unique in that Viva has testified regarding the central role that its attorneys played in formulating its actual knowledge regarding the Policy.

Having determined that an at-issue waiver has occurred in this case, the only remaining question is the scope of disclosure necessary to the resolution of this case. Plaintiff requests that Wells Fargo, Viva, Blackstone, and Preston each respond to eight separate requests for the production of documents and that Viva additionally provides responses to three additional interrogatories. ECF No. 85, at 3. While there may be some privileged information responsive to

19

each of these requests, Defendant need not produce all responsive information to resolve this case. Likewise, it is unclear if production of each of the privileged communications related to due diligence identified in Wells Fargo's, Viva's, Preston's, and Blackstone's privilege logs are necessary to the resolution of this case, as Plaintiff argues. ECF No. 128, at 14. Accordingly, at this time, the Court orders Wells Fargo, Viva, Preston, and Blackstone to each produce[9] within thirty days for in-camera inspection, non-redacted versions of: 1) any information provided to Schulte, Roth and Zabel that the law firm used for the purposes of due diligence related to the Policy; 2) all results of any due diligence Schulte, Roth, and Zabel conducted regarding the Policy communicated to Wells Fargo, Viva, Preston, or Blackstone, including but not limited to the electronic mail communications that Mr. Nelson specifically referenced in his deposition; 3) any recommendations related to the Policy from Schulte, Roth and Zabel, including, but not limited to any recommendations from Schulte, Roth and Zabel that Wells Fargo, Viva, Preston, or Blackstone reduce the amount it pay for the Policy and the basis for any such recommendation. Upon review of the communications, the Court will determine whether disclosure to Plaintiff, under seal, is warranted. To the extent that these communications reference other communications that are necessary to the case, the Court may order their production. If Wells Fargo, Viva, Preston, and Blackstone are unable to produce any documents related to the Policy specifically, the Court will consider whether privileged communications regarding the portfolio of which it was part are necessary. Finally, while the Court denies Plaintiff's request to re-depose Mr. Nelson at this time, to the extent that the produced documents leave any material ambiguity as to Defendant's knowledge, the Court may reconsider this request.

---

[9] To the extent that any document is in the possession of more than one entity, only one entity must produce each responsive document.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Compel is granted, in part, and denied, in part.

So ordered.

Date:   September 19, 2023                    _____/s/_____
                                              Ajmel A. Quereshi
                                              U.S. Magistrate Judge